UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ANTHONY PEREZ,
    *Plaintiff*,

v.

NANCY BERRYHILL, *Acting Commissioner of the Social Security Administration*,
    *Defendant*.

No. 3:17-cv-00055 (JAM)

**RULING ON CROSS MOTIONS TO REVERSE AND AFFIRM THE DECISION OF THE COMMISSIONER OF SOCIAL SECURITY**

Plaintiff Anthony Perez alleges that he is disabled and cannot work as a result of a combination of impairments, including both a cluster of mental illnesses such as depression and post-traumatic stress disorder and also physical impairments, chiefly spinal stenosis in his lower back. He has brought this action seeking review of a final decision of defendant Commissioner of Social Security denying his claim for Supplemental Security Income Benefits. For the reasons that follow, I will grant plaintiff's motion to remand the Commissioner's decision (Doc. #16) and deny defendant's motion to affirm the Commissioner's decision (Doc. #26).[1]

**BACKGROUND**

Anthony Perez has struggled with depression for most of his life, and it is not hard to see why. When he was little, as young as six years old, plaintiff was severely abused by his uncles, both physically and sexually. Doc. #12-3 at 86–87; Doc. #12-8 at 77. After he tried to tell his mother, she whipped him rather than taking any action to protect him. Doc. #12-8 at 177.

---

[1] At the time this case was filed, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration. On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. *See* Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name and the court may order substitution at any time. *Ibid*. The Clerk of Court shall amend the caption in this case.

Plaintiff was also physically abused by his father and witness to his father's violence against his mother. *Ibid*. Unsurprisingly, he has had extraordinary psychological problems ever since. *Id*. at 77. He began using marijuana at the age of nine, drinking alcohol at the age of fifteen, and taking cocaine at the age of eighteen; by the time he was thirty he had also started using heroin. *Id*. at 81. He left home at age sixteen, and appears to have essentially been homeless ever since. *Id*. at 98.[2]

Over the course of his life, plaintiff has attempted suicide six times, employing a wide variety of different methods. *Id*. at 177.[3] At least two of these suicide attempts left him in the hospital, once in 1981 (when plaintiff was sixteen or seventeen) and once in 1998. *Ibid*. During the recent depressive episode that occasioned this application for disability benefits, which episode appears to have begun around March 2014, he has been experiencing nearly constant passive suicidal ideation, as is reflected throughout the record. *See, e.g.*, Doc. #12-8 at 58, 77, 97, 102, 175, 177, 181, 195, 197, 222, Doc. #12-9 at 2, 15, 19, 85, 111, 114. He also actually attempted suicide by cutting his wrists in early May 2014, around the same time that he submitted his application for disability benefits. Doc. #12-8 at 97. Plaintiff has been diagnosed not only with major depressive disorder but also with post-traumatic stress disorder ("PTSD") and with a generalized anxiety disorder. *See, e.g.*, *id*. at 176.

Nor are plaintiff's mental illnesses his only serious medical problems. He has suffered from diabetes mellitus since 2005, *id*. at 24, and the past medical history section on his recent

---

[2] During much of the time frame of this application and litigation, plaintiff appears to have been living with his sister. *See, e.g.*, Doc. #12-3 at 22. Counsel stated at oral argument that his sister has subsequently been evicted because she was not supposed to have anyone staying with her, and that they were both living on the street. Counsel also stated, both at oral argument in this case and in the hearing before the ALJ, that plaintiff's only means of communication is a state-provided cell phone, a so-called "Obamaphone," which will only function for a certain number of minutes per month. Once those minutes have been used up, his lawyers have no reliable means of contacting him.

[3] "Tried to cut wrists, took pills a few times, crashed car, tried to hang self . . . tried to jump out of a window." Doc. #12-8 at 177.

medical records indicates that he has suffered neuropathy in his feet as a consequence of his diabetes. *See* Doc. #12-3 at 105, 108; Doc. #12-8 at 21, 175, 178; Doc. #12-9 at 2, 170, 172, 176. He has had serious lower back pain since 1997, which was diagnosed as lumbar spinal stenosis at around the same time he submitted his application for disability benefits. Doc. #12-9 at 97–99. He additionally suffers from hepatitis C, which seems to have been treated successfully, *see id*. at 123–26. And his medical records also mention hypertension, Doc. #12-8 at 24, 28, asthma, *id*. at 234, Doc. #12-9 at 173, and syphilis, Doc. #12-8 at 37.

The record reflects medical treatment for plaintiff's recent bout of depression beginning on March 20, 2014. Doc. #12-8 at 58. He sought care at Catholic Charities in Hartford on April 25, 2014, which completed a detailed intake evaluation of him, *id*. at 77–91, and on May 14, 2014 went to Hartford Hospital, which discharged him the same day. Doc. #12-9 at 130–43. He was admitted to the Adult Day Treatment program at the Hartford HealthCare Behavioral Health Network on May 22, 2014, and discharged on August 13, 2014. Doc. #12-8 at 233–36. While he was there, his treatment was largely overseen by clinician Traicy A. Garbarino and Dr. Tilla Ruser, MD, who completed an evaluation of his functioning on June 10, 2014, *id*. at 93–96, and an evaluation for purposes of his application for disability benefits from the State of Connecticut on June 13, 2014, *id*. at 220–29.

In early August 2014, plaintiff began treatment at the Wheeler Clinic, where his care was overseen by Peter Rogers, MA, and Dr. Sharon Hasbani, MD. He was briefly discharged from Wheeler Clinic on July 13, 2015, but resumed treatment there eleven days later. Doc. #12-9 at 10, 15. On March 10, 2015, Rogers and Dr. Hasbani completed a medical evaluation in support of plaintiff's application for Connecticut disability benefits. *Id*. at 83–92.

The record also contains evidence concerning plaintiff's course of treatment for his back pain, which is discussed in his medical records as far back as February 2013, *see* Doc. #12-8 at 20. On April 16, 2014, plaintiff saw Dr. Qassem Kishawi, MD, who diagnosed him with spinal stenosis. Doc. #12-9 at 97, 99. At the time plaintiff reported that he had tried physical therapy, which only made the pain worse. *Id*. at 97. Dr. Kishawi prescribed epidural steroid injections, *id*. at 99, and three such injections were performed over the next three months. *Id*. at 100–102. These do not appear to have been very effective either; as of January 28, 2016, plaintiff stated that he was "currently considering recommended back surgery." *Id*. at 167.

Plaintiff has held a number of odd jobs over the years, often working for temp agencies, and was most recently employed assembling cabinets in 2013 and early 2014. Doc. #12-6 at 11–15; Doc. #12-3 at 57–60. According to plaintiff, he was let go from this cabinet-making job because his physical impairments had made him decreasingly capable of performing his work there. Doc. #12-3 at 60 ("And there came a time when I couldn't even hold a drill anymore because my hands cramp up and I couldn't carry anything. I was falling. I fell like three times in the job. I was dropping the countertops. So he [plaintiff's boss] came to me nicely and he told me that they couldn't have me anymore because of my conditions.").

Plaintiff filed a claim for Supplemental Security Income Benefits on May 2, 2014. Doc. #12-6 at 2. His claim was denied initially on July 21, 2014, and then again on reconsideration on September 30, 2014. *Id*. Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and a hearing was held on May 19, 2016. *Id*. at 27, 46–99. The ALJ issued his decision denying plaintiff's application on September 21, 2016, *id*. at 40, and the Social Security Administration's Appeals Council denied plaintiff's appeal of that decision on December 1, 2016. *Id*. at 2. Plaintiff then filed this civil action on January 12, 2017, Doc. #1, and has moved

to reverse the decision of the Commission. Doc. #16. Defendant has cross-moved to affirm the decision of the Commissioner. Doc. #26.

## DISCUSSION

The Court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks and citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (*per curiam*). Absent a legal error, this Court must uphold the Commissioner's decision if it is supported by substantial evidence and even if this Court might have ruled differently had it considered the matter in the first instance. *See Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

To evaluate a claimant's disability and determine whether he qualifies for benefits, the agency engages in a well-established five-step process. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122–23 (2d Cir. 2012). The claimant bears the burden of proving his case at steps one through four. At step one, the claimant must show that he is not currently engaged in substantial gainful activity. At step two, he must show that he suffers from a "severe impairment" that significantly limits his physical or mental ability to do basic work activities. At step three, if the claimant can show that one or more of his severe impairments meets or medically equals in severity one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1, then he will be considered disabled without further inquiry. If not, then at step four he must show that he lacks the residual functional capacity ("RFC") to perform his past work. If the claimant meets his

5

burden at step four, then at step five the Commissioner bears the burden of showing that there is other work which the claimant can perform. *Cage*, 692 F.3d at 122–23.

Here, plaintiff has made numerous objections to the ALJ's decision, including various factual disputes that, under the "substantial evidence" standard, do not furnish plausible grounds for reversal. I conclude that plaintiff has, however, identified three significant errors in the ALJ's decision. First, the ALJ did not consider plaintiff's PTSD and anxiety disorder as severe impairments at step two, and does not otherwise seem to have accounted for these disorders throughout the sequential evaluation process. Second, the ALJ incorrectly discounted the severity of plaintiff's back pain due to the fact that plaintiff has pursued a conservative course of treatment. Third, the ALJ did not follow the treating physician rule.

### *Failure to Adequately Consider Plaintiff's PTSD and Anxiety*

Plaintiff asserts that the ALJ should have found plaintiff's PTSD and generalized anxiety disorder to be severe impairments at step two. In fact, the ALJ did not mention these conditions at step two, neither listing them as severe conditions nor explaining why they were not severe. Doc. #12-3 at 30. Nor does there appear to be any substantial evidence in the record that would support a finding that plaintiff's PTSD and anxiety are not severe impairments; to the contrary, their severity is consistently described in terms very similar to those used for plaintiff's depression, which the ALJ did find to be severe. *Ibid*.

It is often true that an ALJ's error at step two may be harmless provided that the ALJ does identify some other severe impairments and then considers all of a plaintiff's impairments, including those found to be non-severe, in formulating the RFC. *See Woodmancy v. Colvin,* 577 F. App'x 72, 74 n.1 (2d Cir. 2014); *Kapustynski v. Berryhill*, 2017 WL 3715241 at *3 (D. Conn. 2017). Here, however, plaintiff suggests that his PTSD or anxiety might have been considered

6

disabling at step three. *See* Doc. #16-1 at 39. And the ALJ's discussion in formulating plaintiff's RFC makes only passing reference to anxiety or to the symptoms of PTSD, Doc. #12-3 at 30, giving little assurance that these impairments were in fact considered at that stage of the process.

I therefore conclude that the ALJ's error in not considering plaintiff's PTSD and anxiety as severe impairments at step two was not harmless and does require remand. *Cf. Hernandez v. Astrue*, 814 F. Supp. 2d 168, 185 (E.D.N.Y. 2011) (remand required where ALJ did not identify bipolar disorder and anxiety as independent impairments alongside depression and alcohol abuse, and there was no indication ALJ accounted for or meaningfully considered the combination of all plaintiff's impairments throughout entirety of five-step process).

### *Discounting Back Pain Due to Conservative Treatment*

Plaintiff next argues that the ALJ improperly discounted the severity of plaintiff's spinal stenosis and lower back pain because plaintiff's course of treatment was too conservative. I agree. The Second Circuit has cautioned against discounting the opinion of a treating physician merely because the physician recommended a conservative treatment regimen. *See Burgess v. Astrue*, 537 F.3d at 129; *see also Caciopoli v. Colvin*, 2017 WL 3269075, at *4 (D. Conn. 2017).

Here, plaintiff was diagnosed on April 16, 2014 with spinal stenosis by his treating physician, Qassem Kishawi, MD, after trying physical therapy for his back which only made things worse. Doc. #12-9 at 97, 99. Dr. Kishawi stated that he "discussed with the patient and his wife in detail the options of management including the risks and benefits of treatment." *Ibid*. Plaintiff was then prescribed three epidural steroid injections, which he received over the next three months. *Id*. at 99–102. As of February 1, 2016, plaintiff stated that he "has had numerous treatments to lower back" and was "currently considering recommended back surgery." *Id*. at 167. Plaintiff testified at the hearing that that he was considering surgery, but was "kind of

scared of it" because some of his friends had told him that similar surgery had made them get worse. Doc. #12-3 at 62.

The ALJ did find that plaintiff's degenerative disc disease was one of his severe impairments, *id*. at 30, and acknowledged when formulating plaintiff's RFC that the record showed "degenerative changes with possible impingement." *Id*. at 37. He went on to state, however, that "the level of care he has sought and received is not consistent with the degree of pain and functional limitation he alleges. The claimant has had little treatment for his back beyond three epidural steroid injections. . . . Some of his failure to pursue treatment for his back could reasonably be attributed to his homelessness, but he seems able to get to his mental health treatment appointments." *Ibid*.

It was not appropriate for the ALJ to minimize the severity of plaintiff's back condition on the basis of his course of treatment alone where, as here, the record clearly reflects that plaintiff and his doctor carefully considered the best course of treatment to pursue and chose a conservative approach. Nothing in the record suggests that plaintiff's failure to pursue more aggressive treatment reflected anything other than worries that more aggressive treatment options might not help or would not be worth the risk.

Nor is there any other substantial evidence in the record to suggest that plaintiff's spinal stenosis was not as severe as he represented. To the contrary, plaintiff repeatedly described his back pain in striking terms to his doctors. *See, e.g.*, Doc. #12-8 at 135 ("Symptoms are aggravated by ascending stairs, bending, daily activities, descending stairs, extension, flexion, lifting, sitting, standing, twisting and walking. Symptoms are relieved by lying down."); *see also id*. at 124, 128, 150, 153 (substantially the same). Dr. Kishawi's notes from his initial exam of plaintiff state that "patient is . . . in severe distress." Doc. #12-9 at 99. At that exam, plaintiff

stated that his pain was usually 8 on a scale from 0-10, ranging from 10 at its worst to 7 at its best, *id*. at 98–99, and again stated that the pain was aggravated by any physical movement whatsoever, and relieved only by lying flat. *Id*. at 98. Dr. Kishawi relied on these statements in making his diagnosis of spinal stenosis, in prescribing steroid injections, and evidently in ultimately recommending surgery.

Accordingly, on remand, the ALJ should not necessarily penalize plaintiff for having pursued a relatively conservative course of treatment for his spinal stenosis. Instead, the ALJ should evaluate the severity of those symptoms solely in light of what the medical evidence shows, giving due regard to the opinions of Dr. Kishawi, plaintiff's treating physician.

### *The Treating Physician Rule and the Medical Evidence*

Finally, plaintiff contends that the ALJ violated the treating physician rule by "cherry-picking select aspects of the physicians' reports that favor his preferred conclusion and ignoring all unfavorable aspects, without ever explaining his choices." Doc. #16-1 at 42. The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess*, 537 F.3d at 128; 20 C.F.R. § 404.1527(c)(2). Even if the treating physician's opinion is not given controlling weight, the ALJ must consider a number of factors to determine the proper weight to assign, including "the [l]ength of the treatment relationship and the frequency of examination; the [n]ature and extent of the treatment relationship; the relevant evidence . . . particularly medical signs and laboratory findings, supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues." *Burgess*,

9

537 F.3d at 129. After considering these factors, the ALJ is required to "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion. . . . Failure to provide such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id.* at 129–30.

Here, the ALJ considered five different medical opinions, including three from treating sources. Doc. #12-3 at 38. He gave "great weight to the June 10, 2014 opinion of Ms. Garbarino and Dr. Ruser, regarding the claimant's mental health functioning at that time," but gave "less weight to their opinions regarding obvious limitations in various areas of task performance, as they indicated such limitations related to the claimant's chronic pain, which is outside their specialty." *Ibid*. He gave "partial weight" to the June 2014 assessment completed by Garbarino and Ruser for plaintiff's application for Connecticut disability benefits, disregarding that assessment's legal conclusion that plaintiff was unable to work but observing that "the limitations are generally consistent with those contained in their other June 2014 opinion." *Ibid*. He gave "great weight" to the "September 29, 2014 opinion of JoAnne Coyle, Ph.D., a Disability Determination Services psychological consultant, who concluded that the claimant had no more than moderate limitations." *Ibid*. He gave "partial weight . . . to the March 10, 2015 opinion of Mr. Rogers and Dr. Hasbani"; he accepted "most of their opined limitations," which he found "consistent with the record," but gave little weight to "the opined marked limitations" as they were "not supported by the claimant's test scores showing no behavioral issues or coping issues." *Ibid*. Finally, he gave little weight to the "2016 State of Connecticut Department of Social Services determination finding that the claimant lacked the capacity to perform unskilled work activity and was, therefore, disabled," because that determination had been based on the March 2015 Rogers/Hasbani evaluation and because "the claimant's mental health treatment

10

records contemporaneous to the 2016 determination are not supportive of marked limitations as the claimant's anxiety was improved, but he was depressed with a low mood." *Ibid*.

Notably, in discussing these various medical opinions the ALJ did not acknowledge the requirements of the treating physician rule. He did not make a finding that any of the opinions were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques," or were "inconsistent with the other substantial evidence in [the] case record," as the regulations require if a treating source's opinion is to be denied controlling weight. 20 C.F.R. § 404.1527(c)(2).

In the absence of such a finding, the ALJ's reasons were inadequate for discounting part of the opinion of June 10, 2014, by Ms. Garbarino and Dr. Ruser. He gave little weight to their assessment of plaintiff's limitations in task performance, which he claimed fell "outside their specialty." Doc. #12-3 at 38. This was incorrect. The comments written beneath the task performance section of the evaluation stated, "Pt. [patient] has chronic back pain, current sx [symptoms] of depression. Unable to return to work as laborer at this time." Doc. #12-8 at 94. In other words, it listed matters that were both within Dr. Ruser's specialty and outside that specialty. And the limitations they assessed seem more like psychological limitations than physiological ones.[4]

Nor did the ALJ's ruling correctly account for the logical relationship between a treating source's specialty and the weight to be given to the treating physician's opinion. The relevant regulation, 20 C.F.R. § 404.1527(c)(2), which details the weight to be given to a treating

---

[4] Specifically, Ms. Garbarino and Dr. Ruser recorded plaintiff as having no problem carrying out single-step instructions and only slight problems changing from one simple task to another, but serious problems carrying out multi-step instructions, focusing long enough to finish assigned simple activities or tasks, performing basic work activities at a reasonable pace/finishing on time, and performing work activity on a sustained basis. At least the problems with carrying out multi-step instructions and focusing long enough to finish tasks seem clearly psychological rather than physiological.

11

source's medical opinion, does not itself mention specialization. Rather, it states that any treating source opinions will be given controlling weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Ibid*. Only *after* an ALJ has determined that a treating source opinion should not get controlling weight do other factors, including specialization, come into play. *See ibid.*; 20 C.F.R. § 404.1527(c)(5). Here, the ALJ incorrectly used the treating sources' (supposed) lack of specialization as grounds for giving their opinions little weight without ever having made the determination required by § 404.1527(c)(2), and therefore did not follow the treating physician rule. *See Meadors v. Astrue*, 370 F. App'x 179, 182–83 (2d Cir. 2010).

In addition, the ALJ's decision to give little weight to the opinion of March 10, 2015, of Mr. Rogers and Dr. Hasbani concerning plaintiff's marked limitations is not supported by substantial evidence. The ALJ stated that he gave these portions of their opinion "little weight because they were not consistent with the claimant's treatment records. Specifically, the opined marked limitations are not supported by the claimant's test scores showing no behavioral issues or coping issues." Doc. #12-3 at 38. This appears to be a reference to plaintiff's Global Assessment of Functioning ("GAF") scores. *See, e.g.*, Doc. #12-9 at 5–6. But the evaluation by Mr. Rogers and Dr. Hasbani gave plaintiff a GAF score of 48, and stated that 48 was his highest GAF score for the past year. *Id*. at 88.

This was not a score that conflicts with an assessment of severe mental impairments. To the contrary, "a score of 50 indicates serious symptoms (*e.g.*, suicidal ideation, severely obsessive rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (*e.g.*, no friends, unable to keep a job). *All scores below 50 demonstrate*

12

*increasingly greater impairment/symptoms and increasingly more limited function.*" 2 Soc. Sec. Disab. Prac. & Proc. § 22:243 (emphasis added).

Indeed, courts have *reversed* ALJs who failed at least to consider GAF scores of 50 or below as evidence supporting a plaintiff's claim of disability. *Id.* § 22:243 n.5 (collecting cases). And while medical records do indicate GAF scores of 54 and 52 at other points in the spring and summer of 2015, Doc. #12-9 at 6, these appear to be plaintiff's only scores over 50 contained in the record. *See* Doc. #12-8 at 10, 104, 107, 110, 180, 225, 234; Doc. #12-9 at 6. Indeed, by 2016 plaintiff's GAF scores were down to 41 or 40.[5] Doc. #12-3 at 111.

Plaintiff may have slightly improved shortly after being evaluated by Mr. Rogers and Dr. Hasbani to the point where his GAF score was not quite below the threshold for serious impairment. But this fact hardly constitutes significant other evidence inconsistent with their opinion such that it should be denied controlling weight under the treating physician rule— especially since plaintiff then deteriorated to an even worse condition than at the time of his examination. The ALJ, therefore, did not follow the treating physician rule in partially disregarding the opinion of Mr. Rogers and Dr. Hasbani, as well as in partially disregarding the opinion of Ms. Garbarino and Dr. Ruser.

### *Remand, not Reversal, is Appropriate*

Having concluded that the decision of the Commissioner was erroneous, I must next decide whether to remand the case for further evidentiary proceedings, or to reverse the Commissioner's decision and remand solely for calculation and payment of benefits. Where

---

[5] This fact is at odds with the ALJ's statement that "the claimant's more recent 2016 records from Wheeler clinic show improvement," and that "the claimant's mental health treatment records [from 2016] are not supportive of marked limitations." Doc. #12-3 at 36, 38. On remand, the ALJ should account for these very low GAF scores as medical opinion evidence supporting plaintiff's claim of disability. *See* Soc. Sec. Admin., Global Assessment of Functioning (GAF) Evidence in Disability Adjudication, AM-13066 (July 22, 2013) (indicating that, while a "GAF rating along is never dispositive of impairment severity," GAF scores do constitute medical opinion evidence under 20 C.F.R. § 404.1527(a)(2)).

there are gaps in the administrative record or the ALJ has applied an improper legal standard, a remand for further development of the evidence is appropriate. But where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the Court may reverse and remand solely for calculation and payment of benefits. *Parker v. Harris, 626* F.2d 225, 235 (2d Cir. 1980).

On balance, I find that remand rather than reversal is warranted here, because it remains unclear whether there may be reasons that are factually and legally sufficient to deny plaintiff's application. It is not clear, for instance, whether plaintiff's PTSD and anxiety, if they had been properly considered severe impairments at step two, would have been considered disabling at step three, or if not how they would have affected plaintiff's RFC at step four and therefore the ALJ's conclusion at step five. This is unlike a case where the Commissioner fails to carry its burden at step five, for which outright reversal is warranted. *Compare Torres v. Colvin*, 2017 WL 1734020, at *3–4 (D. Conn. 2017).

## CONCLUSION

For the foregoing reasons, plaintiff's motion to reverse (or remand) the decision of the Commissioner (Doc. #16) is GRANTED, and defendant's motion to affirm the Commissioner's decision (Doc. #26) is DENIED. The case is remanded to the Commissioner for further proceedings consistent with this opinion.

It is so ordered.

Dated at New Haven this 24th day of January 2018.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge